Richard **WRIGHT**, Trustee of the, **Buchheim Pasture Trust,** **Petitioner,**

v.

**HORSE CREEK RANCHES,** a Colorado partnership; Shirley Sanders, individually and as President of Red Mountain Enterprises, Inc., a partner in Horse Creek Ranches; Ronald W. Stucki, individually and as a partner in Horse Creek Ranches; Willis Bettis, Individually and as Secretary of Red Mountain Enterprises, Inc., a partner in Horse Creek Ranches; and Red Mountain Enterprises, Inc., a Colorado corporation, **Respondents.**

No. 82SC420.

Supreme Court of Colorado, En Banc.

March 25, 1985.

Brown & Brown, James D. Brown, Delta, for petitioner.

Woodrow, Roushar & Weaver, Frank J. Woodrow, Montrose, for respondents.

KIRSHBAUM, Justice.

We granted certiorari to review the judgment of the Court of Appeals in *Wright v. Horse Creek Ranches,* 659 P.2d 705 (Colo. App.1982), affirming the trial court's decision that Horse Creek Ranches (Horse Creek), a Colorado partnership, and its individual partners are the owners of an easement across property owned in trust by Richard Wright (Wright) which entitles them to use an access road located on the Wright property for "recreational residences (specifically excluding any perma-

nent residence and any residency on a year around basis)"[1] We affirm in part and reverse in part.

In 1972, Wright, as trustee of the Buchheim Pasture Trust, purchased the 402-acre Buchheim Ranch for the benefit of the three children of the settlor of the trust. The property, located on the south side of Grand Mesa near Delta, Colorado, is used for cattle ranching. It lies west of another ranch known as the Bull Ranch, which in turn lies to the west of the Cockcroft Ranch. The Buchheim Ranch lies east of the Geyer Ranch, a tract of some 830 acres of land which was purchased in 1956 or 1957 by the Geyer family and used continuously for cattle ranching until August of 1978, when it was acquired by Horse Creek.

Since 1957, these four ranches have been accessible from a county road by means of a private dirt road which traverses the Cockcroft, Bull and Buchheim Ranches before reaching the Geyer Ranch.[2] Until July of 1979, this access road was barely wide enough to permit a single vehicle to negotiate its rocky bed, was not suitable for passenger cars and was passable only six months out of the year. The road was used primarily for access to ranching operations, although it was sporadically used for such activities as logging, sightseeing and hunting. Water commissioners also used the road to make inspections. Although remnants of four abandoned cabins exist on the Geyer Ranch, from 1957 to 1978 the road was not used for access to any residence on that property.[3]

On July 20, 1978, Wright and the owners of the other three ranches entered into an agreement, termed an "Easement Declaration and Agreement," which document contains the following pertinent paragraphs:[4]

2. Each of the undersigned declares that, for more than twenty (20) consecutive years last past, access to their respective properties in said Sections 21, 22 and 23 has been provided by a privately owned and maintained dirt road which extends through said property owned by the undersigned persons to and from the public road known as the Surface Creek Road. Each party acknowledges the right of all other parties to this agreement, their heirs, successors and assigns to use and maintain such private road in the same condition as the same presently exists as an access easement to their respective properties.

3. It is agreed that no alterations or improvements to the existing private road shall be made by any party to this agreement without the prior consent of the landowner whose property underlies the affected portion of the road. Simple repairs to the existing private road may be made when necessary to keep the same passable by ordinary two-axle passenger vehicles; provided, however that the cost of such repairs shall be borne by the party making the repairs.

4. This agreement shall run with the land owned by the parties hereto and shall be binding upon the parties themselves, their heirs, successors and assigns.

After the parties reached this agreement, Horse Creek purchased the Geyer Ranch for the purpose of subdividing it into smaller parcels of no less than forty acres each, to be sold as recreation residential property. Neither Wright nor Bob J. Cockcroft, who owned the Cockcroft Ranch, was informed of such intended use when they executed the agreement. The agreement apparently was obtained by the Geyers to

---

1. The trial court also declared that Horse Creek was entitled to use the easement for additional purposes. No appeal has been taken from those portions of the judgment.

2. The record does not reveal what other means of access are available to portions of these four ranches.

3. The record indicates that fence-mending crews occasionally, in inclement weather or during extended stays, used the remnants of the cabins in connection with their ranching activities.

4. The document indicates that the parties reached their agreement on July 20, 1978, although Wright did not execute the document until August 11, 1978.

satisfy certain title insurance requirements in connection with the Horse Creek transaction.

On July 3 and 4, 1979, a contractor employed by Horse Creek performed extensive work on portions of the road which traversed the Buchheim Ranch. As a result, the road was substantially widened; certain obstructions such as rocks, trees and brush were removed; and the bed of the road was flattened. Horse Creek did not obtain permission from Wright or any other of the signatories to the agreement to perform this work.

On February 22, 1980, Wright filed this action against Horse Creek and the members of the partnership. The complaint sought a declaration of rights, an injunction prohibiting allegedly unauthorized use of the access road, and damages. All damage claims have been settled; thus, the only matters decided by the trial court concerned the extent of the easement Horse Creek acquired when it purchased the Geyer Ranch in 1978.

The trial court found that a trend toward subdividing large ranches into smaller agricultural and recreational tracts had developed in the Delta area. It then stated the following pertinent conclusions:

[Horse Creek's] predecessors in title established a prescriptive right in the road in question, which right was later reduced to writing as set forth in [the agreement], which agreement ... allows the owners of the adjoining land the use of said private road in the same condition, but makes no use restrictions, and that [Horse Creek's] present use of the road to service owners of 40 acre tracts was reasonably foreseeable and not an unreasonable burden on the servient estate of [Wright].

. . . .

In the case at bar the Court concludes that it would certainly be foreseeable during the end of the 20 year period just prior to July 20, 1978, that large ranches are apt to be divided into smaller tracts, and it was certainly foreseeable at the time that [the agreement] was entered into on July 20th, 1978.

Wright appealed, and a divided division of the Court of Appeals affirmed. *Wright v. Horse Creek Ranches*, 659 P.2d 705 (Colo.App.1982). The majority concluded that the easement "is precisely the same one that was acquired by prescription," *id.* at 708, and that the July 20, 1978 agreement "confirms and, by reasonable interpretation, defines the nature and extent of the easement, the rights concerning which were originally acquired by prescription." *Id.* at 707. The majority also stated, however, that the 1978 agreement "effectuated an express grant of an easement" and that parties to a grant of an easement can be assumed to have contemplated a "normal development of the use of the dominant tenement." *Id.* at 708. The majority concluded that subdivision of the Horse Creek property "was a normal and foreseeable development [which] the parties could reasonably have anticipated." *Id.* The majority remanded the case with directions that the trial court describe the easement with particularity.

■■■ An easement is an interest in property which, though distinct from an ownership interest in the land itself, nevertheless confers upon the holder of the easement an enforceable right to use property of another for specific purposes. *DeReus v. Peck*, 114 Colo. 107, 162 P.2d 404 (1945); *see Lehman v. Williamson*, 35 Colo.App. 372, 533 P.2d 63 (1975). Because the interest is itself non-possessory, the holder of an easement does not have the degree of control over the burdened property that is enjoyed by the owner of the servient estate, *see Restatement of Property* § 450 (1944); *id.* comment b.

■■■ An easement may be established in a number of ways: by necessity, *Martino v. Fleenor*, 148 Colo. 136, 365 P.2d 247 (1961); *Yunker v. Nichols*, 1 Colo. 551 (1872); by preexisting use, *Martino*, 148 Colo. 136, 365 P.2d 247; by express or implied grant, *Wagner v. Fairlamb*, 151 Colo. 481, 379 P.2d 165 (1963), *cert. denied*

375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 110 (1963); or by prescription, *Gleason v. Phillips*, 172 Colo. 66, 470 P.2d 46 (1970); *Allen v. First National Bank of Arvada*, 120 Colo. 275, 208 P.2d 935 (1949). Because the range of permissible uses of any particular easement is in the first instance defined by the circumstances surrounding the creation of that easement, precise delineation of the means by which a particular easement is acquired is critical to any determination of the extent to which the owner of the dominant estate is entitled to burden the servient estate. Our initial inquiry, therefore, must focus upon the nature of the easement Horse Creek owns.

Although the trial court concluded that the easement owned by Geyer had been obtained by prescription, it also suggested that the July 20, 1978 agreement changed the nature of that easement—a suggestion apparently adopted by the majority of the Court of Appeals. The agreement contains no language, however, indicating that the parties thereto intended to create any new rights or privileges. It contains no terms of conveyance, grant or new entitlement; indeed, with the exception of the title, it does not refer to an "easement" at all. We conclude that, as both Wright and Horse Creek agreed at trial, the agreement merely reflects a legally significant circumstance which the signatories already understood—that between 1957 and 1978 all of them had acquired easements by prescription over so much of the other properties as was necessary to obtain access to their properties. To construe such document as granting new obligations or benefits does violence to its terms and contravenes the intent of those who executed it.

The conclusion that Horse Creek acquired an easement established by prescription, rather than one created by grant, is critical to the selection of the test to be applied to Wright's claim of unauthorized use of the easement. *Compare Restatement of Property* §§ 477–81 (1944) (easements created by prescription) *with id.* §§ 482–86 (easements created by convey-ance). Because an easement directly affects ownership rights in the servient tenement, *DeReus v. Peck*, 114 Colo. 107, 162 P.2d 404 (1945), judicial delineation of the extent of an easement by prescription should be undertaken with great caution.

Section 477 of the *Restatement of Property* offers the following principle as a reasonable standard for determining the extent of easements established by prescription: "[t]he extent of an easement created by prescription is fixed by the use through which it was created." *Restatement of Property* § 477 (1944). One justification for the principle that a non-owner may establish a legally protected right to burden property possessed by another is the theory that by not protesting the adverse use to which the non-owner has put the property, the property owner can be presumed to have agreed to burden the servient estate to that degree. *See id.* comment b. Such agreement can be presumed only if the adverse use is open as well as continuous. *See id.* § 458(c) (1944); *id.* comment h. No presumption of voluntary forfeiture of incidents of ownership can be premised on conduct not performed and, therefore, not amenable to protest by the owner of the servient estate. We agree with the formulation of the test for determining the extent of easements acquired by prescription set forth in section 477 of the *Restatement of Property* and adopt it for this jurisdiction.

Section 478 of the *Restatement of Property* states as follows:

> In ascertaining whether a particular use is permissible under an easement created by prescription a comparison must be made between such use and the use by which the easement was created with respect to (a) their physical character, (b) their purpose, (c) the relative burden caused by them upon the servient tenement.

*Id.* § 478. This rule recognizes that human behavior and the circumstances which influence it inevitably change. Thus, the beneficiary of an easement established by

prescription will be permitted to vary the use of the easement to a reasonable extent. This flexibility of use is limited, however, by concern for the degree to which the variance further burdens the servient estate. The imposition of this limitation is emphasized by section 479 of the *Restatement of Property*, which states as follows:

> In ascertaining whether a particular use is permissible under an easement appurtenant created by prescription there must be considered, in addition to the factors enumerated in § 478, the needs which result from a normal evolution in the use of the dominant tenement and the extent to which the satisfaction of those needs increases the burden on the servient tenement.

*Id.* § 479.

In *Westland Nursing Home, Inc. v. Benson*, 33 Colo.App. 245, 517 P.2d 862 (1974), the Court of Appeals expressly adopted the standards articulated by the American Law Institute in sections 478 and 479 of the *Restatement of Property* for assessing permissible uses of prescriptive easements. We agree with the *Westland Nursing Home* court that these standards reflect the law of this jurisdiction.

Both the trial court and the majority of the Court of Appeals focused their attention almost exclusively on the "normal evolution" standard of section 479. However, application of the balancing test of section 479 does not obviate the obligation to consider the factors enunciated in section 478 in determining whether a particular use is authorized by a prescriptive easement. The standards contained in both sections must, therefore, be applied to the circumstances of this case.

The use to which the private road was put during the relevant prescriptive period was described by Bob J. Cockcroft and by Darrell Geyer as use primarily for ranching purposes, with occasional traffic by hunters, loggers and water commissioners. When asked if the road had ever been used "for access to any residence or home on the Geyer property," Cockcroft answered "[d]efinitely not." Mr. Geyer testified that he agreed with Cockcroft's testimony concerning the use of the road during the prescriptive period.[5]

■ In assessing this testimony, the trial court concluded that the property was historically used "primarily for agricultural purposes, but has also on occasion been used for hunting, both private and commer-

---

5. Darrell Geyer's testimony in this respect is as follows:

> Q  Did you hear the testimony of Mr. Cockcroft ... as to the purposes for which this road had been used with respect to access to the Geyer Ranch during the 20 years that he owned his place?
> A  Yes.  It was used for ranch use.  The District Water Commissioner uses the road, he comes in, clear in to my place to check the water weir there.  And other than that, about the same as Mr. Cockcroft said.
> Q  All right.  In other words, is it your testimony that during the 21 years that you owned the ranch ... the purposes for which this road was used were the same as testified by Mr. Cockcroft, with the additions you just now made, is that right?
> A  Yes.  Other than letting hunters in, and this sort of thing.
>   . . . .
> Q  You agree with Mr. Cockcroft's statement that during the 21 years that you owned the property that this access road through the Buchheim property was not ever used for any residence or home up there on that property?

> A  No.  Other than a cow camp that we would stay in the spring, and build fence, and a few things like that, and hunters in the fall in the cabin.
> Q  You said "cabin."
> A  The old cabin, yes.
>   . . . .
> Q  Okay.  And you're saying during the 21 years that you used the ranch, that old cabin was sometimes used by you for when you went up there to build fence?
> A  That, and that camp trailer that was left there.
> Q  You stayed in the camp trailer that was there?
> A  Stayed in the camp trailer or the cabin. Usually we had a crew of men and we would stay in both.
>   . . . .
> Q  All right.  Was there any other use made of the Geyer Ranch between 1955 and 1957 when you bought it than what you have already testified to?
> A  Not to my knowledge.

cial, some residential, ... recreational, timbering and some use by the Water Commissioner." While the trial court's findings of fact may not be set aside if supported by the record, *Marez v. Dairyland Insurance Co.*, 638 P.2d 286 (Colo.1981), they cannot stand if the record contains no evidence to support them. *Gebhardt v. Gebhardt*, 198 Colo. 28, 595 P.2d 1048 (1979). A thorough canvassing of the evidence in this case leads inescapably to the conclusion that the trial court erred in concluding that the extent of the easement acquired by the Geyers included use for residential purposes.

The evidence is unchallenged that from 1958 to 1978, the road was not used for residential purposes. The only evidence remotely suggesting any residential use at any time consisted of testimony that the remnants of three or four old cabins had occasionally been used for ranching and hunting purposes. At best, such evidence may by inference indicate that at some time prior to the prescriptive period the road may have been used for residential purposes; it does not establish the open, notorious and continuous use essential to establish a use by prescription. *See, e.g., Rivera v. Queree*, 145 Colo. 146, 358 P.2d 40 (1960); *Agricultural Ditch & Reservoir Co. v. Gleason*, 686 P.2d 802 (Colo.App.1984). This evidence does not support the trial court's conclusion that the prescriptive easement acquired by Geyer included use for residential purposes. Horse Creek, of course, obtained no greater easement than the Geyers had acquired.

The use to which Horse Creek seeks to put the easement includes use for recreational residential purposes. This represents a change in kind of use. It is a change which by necessity will subject the servient estate to increased burdens. Both Cockcroft and Wright testified that any increased traffic on the road would impede their ranching operations, and their testimony was not contradicted.

The change in the dominant estate, of course, is the change from a single, large agricultural enterprise to a recreational development area consisting of several smaller tracts owned by several individuals. The physical character of the easement has been substantially altered from a ten-foot wide primitive road to a passageway which now is twenty-one feet wide and accommodates two vehicles simultaneously. The purpose of the new use has changed from permitting infrequent access for ranching needs to encouraging frequent use by owners and their guests for recreational residence purposes. Finally, uncontradicted evidence established that the Buchheim Ranch will be burdened by the new use. Considering all of these factors, rather than focusing exclusively on the fact that subdivision of ranch properties was an inevitable phenomenon, we conclude that the trial court erred in enlarging the permissible use of the prescriptive easement acquired by Horse Creek to include recreational residence purposes.

Our conclusion is buttressed by decisions of courts in other jurisdictions grappling with similar situations. In *Gibbens v. Weisshaupt*, 98 Idaho 633, 570 P.2d 870 (1977), the Supreme Court of Idaho considered a suit by the owner of a dominant estate to prevent the owner of the servient tenement from restricting the width of a private access road. The only access to a 700-acre tract of land was a private road across a twenty-acre servient tenement. A single-family residence and a farm existed from 1940 to 1967 on the servient tenement, and a single-family residence and cattle ranch existed on the 700-acre tract. In 1967, the larger tract was purchased and the new owner sold ten acres to a corporation which built several greenhouses employing a total of twenty to thirty people. In 1970, the owner of the larger tract sold ten-acre lots to other families, who built homes on the sites. When the owner of the servient tenement reduced the width of the access road, the owner of the dominant estate filed suit. The Supreme Court of Idaho concluded that reduction of the road was impermissible because it reduced the use established by prescription, but also held that use of the access road must be limited to that transportation necessary for access to a single-family residence and cat-

tle and farming operations—not to the expansive use contemplated for multiple family residences and commercial greenhouse activities. In *Aztec Ltd. v. Creekside Investment Co.*, 100 Idaho 566, 602 P.2d 64 (1979), the Idaho Supreme Court again concluded that the development of residential properties involving some 200 people constituted an impermissible increase in use in view of the fact that the use established by prescription was limited to access to a single residence. Similar analyses and results are to be found in *Gaither v. Gaither*, 165 Cal.App.2d 782, 332 P.2d 436 (1958), and *Firebaugh v. Boring*, 288 Or. 607, 607 P.2d 155 (1980).

Horse Creek's use of its prescriptive easement for recreational residence purposes constitutes a change in kind when compared to the use it acquired, has altered the physical characteristics of the road, and has imposed additional and non-consensual burdens upon the Buchheim Ranch. We conclude that under these circumstances the use is not permissible. Accordingly, the trial court erred in concluding that the access road may be used by Horse Creek for recreational residence purposes.

The judgment of the Court of Appeals is affirmed with respect to its conclusion that the case must be remanded to the trial court with directions to specify the location of the easement, and is otherwise reversed.