Thomas E. PRICE, Jr., Appellant,

v.

Mike EASTHAM, Veldon "Spud" Dillon, Lorraine Templeton, Bruce Turkington, Lee Krumm, La Velle Dillon, Bob Fenex, Carol Fenex, Bruce Willard, Linda Willard, Butch Bullard, Gordon Grebe, Diane Grebe, Eric Overson, Sam Matthews, Nancy Matthews, Ray Kranich, Eilene Wythe, Jack Alexander, Sue Alexander, Rick Alexander, Reed Alexander, Dave Sanders, Shirley Sanders, Greg McCullough, Lloyd Moore, Penny Moore, Tammy Hagan, Chuck Hagan, Kate Mitchell, Ben Mitchell, Ronnie Morrison, Barb Hrenchir, Mike Hrenchir, Gus Weber, Rita Weber, Bob Simcoe, Mark Jacobs, Barb Jacobs, Sharon Thompson, Rick Thompson, Fred Thompson, Connie Thompson, Mike Devaney, Rick Anderson, Dave Weber, Mark Robl, Terry Robl, Toras Fisk, Dave Boone, Marasha Boone, George Eschin, Jim Bills, Mike O'Malley, Joe O'Malley, Bill Markel, Gordon Berg, Floyd Newkirk, Karl Horst, Robert Pelky, Robert Plymire, Don Blackwell, Valda Ziemelis, Randy Whitehorn, Connie Whitehorn, Willie Bishop, Hans Albertson, Bill Sampson, Mike Arno, Allen Englebretson, Rodney McLay, Jim Spencer, Jimmy Spencer, Joe Wright, Jason Kinnard, Amy Kinnard, Sam Wright, Paul Budge, Brian Bellamy, Rick Wise, Nathan Wise, John Wise, Jacob Wise, Marty Wise, Jake Ellyson, Carol Ellyson, Bill Sheldon, Leroy Cabana, Sr., Doris Cabana, Larry Cabana, Dawn Cabana, and Scott Connelly, Appellees.

No. S–13167.

Supreme Court of Alaska.

July 15, 2011.

Thomas E. Price, Jr., pro se, Homer, Appellant.

Scott A. Brandt–Erichsen, Ketchikan (limited appearance for oral argument) for Appellant.

C. Michael Hough, Homer, for Appellees.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Thomas Price posted "No Trespassing" signs on his property in 1998 because he believed an excessive number of snowmachiners were using a trail that crossed his land, damaging it, traveling at high speeds, and causing a great deal of noise. In 2003, we held that a group of snowmachine users had established a public prescriptive easement over the trail, but we twice remanded this case to the superior court to define the scope of the easement. The superior court held additional hearings and in 2007 it issued a memorandum opinion and order defining the scope of the easement. Price appeals.

We affirm the superior court's decision that Price did not meet his burden of proving that the volume of snowmachine traffic had exceeded the scope of the easement. But we reverse the superior court's decision that the easement includes non-snowmachine users because the court did not make the necessary

findings that these non-snowmachine users satisfied the elements required to establish prescriptive rights. We remand for further clarification of the permissible scope of the snowmachine easement, including its seasonal limits, width, and speed limit. We affirm the superior court's ruling that snowmachine users may clear, groom, and mark the trail.

## II. FACTS AND PROCEEDINGS

This is the third time this case has come before us. The facts have been thoroughly set out in our earlier opinions in this case.[1] To summarize, in July 1978 Thomas Price purchased an agricultural interest from the State of Alaska in land located at the head of Kachemak Bay.[2] A group of snowmachiners had used a seismic trail that crosses this land for a number of years,[3] but Price perceived that the volume of snowmachine traffic increased significantly in the years after he purchased it.[4] He complained of snowmachines crossing his land at high speeds, creating a safety hazard and a lot of noise, and that some users had littered, ventured off the trail, made campfires, and used the trail after it started to thaw in the spring. He alleged that use of the trail in the spring created deep ruts across his property that filled with water. Price posted "No Trespassing" signs on his property in the winter of 1998–99.[5] The snowmachiners sued Price, alleging that they had established an easement by prescription before Price posted the signs.

At the first trial, the superior court concluded that the trail across Price's land was a right-of-way under 43 U.S.C. § 932, Revised Statute (RS) 2477.[6] On reconsideration, the superior court supplemented its earlier order and concluded that the snowmachiners had established a public prescriptive easement.[7] The superior court's ruling briefly discussed the elements of a prescriptive easement, but "decline[d] to exactly delineate the terms and conditions of the public easement [because it] exist[ed] at [that] point only as a contingency" to the RS 2477 right-of-way.

Price did not appeal the superior court's "findings on any of the elements [necessary] to establish a prescriptive easement."[8] Price's appeal concerned whether a prescriptive easement could be obtained over land in which the State retained an interest.[9] Price argued that "because he only owned the agricultural interests in his land during the relevant time period and because the state retained all other interests, any claim of a prescriptive easement across his land violate[d]" AS 38.95.010, which prohibits people from acquiring interests in state land through prescription.[10] We rejected that argument, noting that the plaintiffs claimed a prescriptive easement against Price's interest in the land, not the State's. In *Price I*, we reversed the superior court's determination that a public right-of-way existed under RS 2477 because the parties did not have an opportunity to address the issue,[11] but we affirmed the superior court's alternate conclusion that a public prescriptive easement had been established.[12] We remanded to the superior court to define the scope of the

---

1. *Price v. Eastham (Price II)*, 128 P.3d 725 (Alaska 2006); *Price v. Eastham (Price I)*, 75 P.3d 1051 (Alaska 2003).

2. *Price I*, 75 P.3d at 1054.

3. *Price II*, 128 P.3d at 726–27.

4. *Id.* at 726.

5. *Id.*

6. *Price I*, 75 P.3d at 1054. Before its repeal in 1976, RS 2477 granted rights-of-way for the construction of highways over federal public lands not reserved for public uses. *Id.* at 1055. "[A]n RS 2477 right-of-way automatically came into existence 'if a public highway was established across public land in accordance with the law of

Alaska.'" *Id.* (citing *Fitzgerald v. Puddicombe*, 918 P.2d 1017, 1019 (Alaska 1996)). The issue of whether an RS 2477 right-of-way existed over Price's land "had not been raised by the parties at trial." *Price II*, 128 P.3d at 727.

7. *Price I*, 75 P.3d at 1054.

8. *Id.* at 1057 n. 22; *see also id.* at 1056–58.

9. *Id.* at 1056–57.

10. *Id.* at 1057.

11. *Id.* at 1056, 1059; *see also Price II*, 128 P.3d at 727.

12. *Price I*, 75 P.3d at 1059.

easement.[13]

On remand, the superior court issued a very brief order defining the easement as 16 feet wide and providing a legal description of its general direction.[14] Because the superior court's order did not provide sufficient findings for a meaningful review under Civil Rule 52(a), *Price II* remanded the case to the superior court again.[15] We directed the superior court to define the easement's scope in light of our decision in *Price I* and the Restatement (Third) of Property, and explained that the superior court was free to "conduct additional evidentiary hearings concerning the changes in frequency, intensity, and manner of use of the easement" since it was established.[16]

The superior court held additional hearings in 2006 and found that users of the trail included snowmachiners, four-wheelers, hikers, persons training their sled dogs, occupants of three residences along the trail, hunters, skiers, recreational RV users, and berry pickers. Focusing on the snowmachiners, the superior court heard testimony that snowmachine traffic may have increased during the years 1996–98.[17] The superior court found that while the number of snowmachines increased, the use of snowmachines may have later subsided and "[a]ny increase in snowmachine traffic has been reasonable and consistent with traditional uses of the easement area." The superior court's decision expressly allowed the snowmachiners to remove deadfall along the trail for maintenance and safety, and to place markers and

groom the trail to identify the easement's boundaries. The superior court redefined the width of the easement as 18–feet wide—a two foot increase from its order in *Price II*[18]—concluding this width is "sufficient to permit two snowmachines traveling in opposite directions to pass each other safely." Finally, the superior court declined to restrict the use of the easement to "winter time" because this would violate the non-snowmachine users' access to the trail.

Price appeals the superior court's rulings.

## III. STANDARD OF REVIEW

■■■ "We review the superior court's factual findings ... for clear error, which we find only 'when we are left with a definite and firm conviction based on the entire record that a mistake has been made.'"[19]

## IV. DISCUSSION

### A. *Price II* Remanded This Case For A Determination Of The Scope Of The Snowmachine Easement.

1. *Price I* and *Price II* describe the guiding principles for defining the scope of an easement by prescription.

■■■ The creation of a public prescriptive easement requires the same elements as a private prescriptive easement, except that "a public prescriptive easement requires qualifying use by the public, while a private prescriptive easement requires qualifying use only by the private party."[20] We have previ-

---

13. *Id.*

14. *Price II*, 128 P.3d at 727.

15. *Id.* at 731. Alaska Rule of Civil Procedure 52(a) states, in relevant part: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon."

16. *Price II*, 128 P.3d at 731.

17. The superior court noted that it was unclear based on the testimony whether the increase in traffic was over Price's property or on trails in general.

18. *Price II*, 128 P.3d at 726.

19. *In re Protective Proceedings of W.A.*, 193 P.3d 743, 748 (Alaska 2008) (quoting *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004)).

20. *Interior Trails Pres. Coal. v. Swope*, 115 P.3d 527, 529 (Alaska 2005) (quoting *Brimstone Mining, Inc. v. Glaus*, 317 Mont. 236, 77 P.3d 175, 181 (2003)) (internal quotation marks omitted). The requirements for establishing a prescriptive easement have been well-established. As we explained in *Dillingham Commercial Co., Inc. v. City of Dillingham*:

 The requirements for establishing a public easement by prescription are nearly identical to the requirements of adverse possession, and the string of adjectives used to describe prescription have a familiar ring: the use must be open, notorious, adverse, hostile, and continuous.... These general requirements have been reduced to a simple statement by this court ... "(1) the [use] must have been continuous and uninterrupted; (2) the [user] must have acted as if he were the owner and not merely one acting with the permission of the owner; and

ously held that "a prescriptive easement obtained by the general public gives the right of use to the public at large." [21] But this right of use is not unlimited; rather the "public at large" is constrained to using the easement only for those types of uses that led to its establishment. As we explained in *Price I*, "[t]he scope of a prescriptive easement is defined narrowly to include only the 'use that created the easement and closely related ancillary uses.' " [22]

 In *Price I* we remanded this case with instructions to the superior court to delineate the scope of the prescriptive easement by imposing restrictions upon it, including, "for example, limiting use to certain seasons, prescribing the width of the easement, and specifying the precise uses that may be made of the easement." [23] *Price I* explained that "[b]ecause an easement directly affects ownership rights in the servient tenement, judicial delineation of the extent of an easement by prescription should be undertaken with great caution." [24] *Price I* also quoted the Restatement (Third) of Property to explain that a determination of an easement's scope should focus on "what a landowner in the position of the owner of the servient estate should reasonably have expected to lose by failing to interrupt the adverse use before the prescriptive period had run." [25] *Price I* concluded: "Although the use made of a prescriptive easement may evolve beyond the original prescriptive uses, new uses cannot substantially increase the burden on the servient estate or change the nature and character of the easement's original use." [26]

In *Price II*, we decided the brevity of the superior court's order on remand did not allow for meaningful review under Civil Rule 52(a). [27] We remanded the case again and directed the superior court to "make specific factual findings regarding ... the original purpose and use of the easement; any changes that have been made in the use of the easement; and, finally, the reasonableness of that change, taking into account such factors as the speed of the changes in use, damage to the estate, and the reasonable expectations of the servient landowner." [28]

The superior court conducted an evidentiary hearing in 2006, after our decision in *Price II*. The superior court considered Price's testimony that a club of snowmachiners ("the Snomads") leased a parking lot in 1996 and this allowed more of the club members to get to the trail that crosses his property. According to the superior court, some Snomads used the trail to access the recreational area in Caribou Hills. But the superior court also heard testimony that the Snomads built a nearby clubhouse in 2000 and that some of the snowmachiners who parked in the leased lot did not travel across Price's property, but instead traversed a different route to get to their clubhouse.

In 2007, the superior court issued a ten-page memorandum opinion and order redefining the scope of the easement. The order described the permissible types of uses, the width of the trail, and the volume of use. The superior court found that "[t]hose presently using the trail, and those who have used the trail [during the prescriptive period], primarily use snowmachines, *but the*

(3) the [use] must have been reasonably visible to the record owner."
705 P.2d 410, 416–17 (Alaska 1985) (quoting *Alaska Nat'l Bank v. Linck*, 559 P.2d 1049, 1052 (Alaska 1977)) (internal citations omitted); *see also McGill v. Wahl*, 839 P.2d 393, 397 (Alaska 1992) (citing *Swift v. Kniffen*, 706 P.2d 296, 302 (Alaska 1985)).

21. *Interior Trails*, 115 P.3d at 529–30 (citing *Elmer v. Rodgers*, 106 N.H. 512, 214 A.2d 750 (1965)).

22. *Price I*, 75 P.3d 1051, 1058 (Alaska 2003) (quoting RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4.10 cmt. d (2000)).

23. *Id.* at 1059.

24. *Id.* at 1058 (quoting *Wright v. Horse Creek Ranches*, 697 P.2d 384, 388 (Colo.1985)) (internal quotation marks omitted).

25. *Id.* (quoting RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4.1 cmt. h (2000)) (internal quotation marks omitted).

26. *Id.* (citing *House v. Hager*, 130 Or.App. 646, 883 P.2d 261, 264–65 (1994)).

27. *Price II*, 128 P.3d 725, 731 (Alaska 2006).

28. *Id.* at 732.

trail has also seen some use by four-wheelers, hikers, persons training their sled dogs[,] and by occupants of the three residences located along the trail, hunters, and berry pickers." The superior court concluded that these uses all should be included in the public easement across Price's land. The superior court further found that although the volume of snowmachine traffic increased at some point after the easement was perfected, it may have later subsided—perhaps due to the construction of the Snomad's clubhouse—and that overall the increase was not a significant burden on the servient estate.

## 2. The easement established at the first trial was a snowmachine easement.

Price now argues the scope of the easement should be limited to the types of users who "qualif[ied] for inclusion within [its] initial scope": snowmachiners. We agree with Price that the superior court's findings in its 2007 memorandum decision and order do not support the conclusion that non-snowmachine users have established the elements for easements by prescription.

We wrote in *Price I* that "Price does not dispute the trial court's findings on any of the elements to establish a prescriptive easement." [29] There was considerable evidence at the first trial supporting the findings necessary to establish a prescriptive snowmachine easement, and this limited easement is what we meant when we referred to the prescriptive elements as undisputed in *Price I*. The public prescriptive easement over Price's land meant that the easement was open to the general public, not just the plaintiffs, for snowmachine use. We did not intend to suggest that members of the general public could use the easement for other uses

without clear findings that these users independently satisfied the requirements for establishing a prescriptive easement. *Price I* did not explicitly state that the established easement was a *snowmachine* easement, but the evidence the superior court relied upon was overwhelmingly evidence of snowmachine use and it was this use that was the focus of Price's original complaint of increased traffic and annoyance.[30] Nothing in *Price II* suggested a more expansive remand; that decision was based solely on the need to have sufficient findings to allow for meaningful review.[31]

■■■■ Our decision today limiting the permissible users of the prescriptive easement is not intended to suggest that other types of users cannot use the trail with Price's permission. Indeed, it appears to us that the non-mechanized users accessing the trail are not objectionable to Price. Nor does this opinion suggest that other types of users cannot establish prescriptive rights to use the trail. But other types of users cannot skip the requirement of proving that their use satisfied the elements required for establishing an easement by prescription. The superior court did not make explicit findings on whether non-snowmachine users had independently satisfied the required elements for establishing an easement by prescription; it only concluded that the trail "has ... seen some use by" other types of users. Therefore, we hold that the scope of the prescriptive easement is limited to snowmachine users.[32]

## B. The Scope Of The Established Easement For Perfected Users

Price contends that the superior court erred in its findings concerning the ease-

---

29. *Price I*, 75 P.3d at 1055 n. 22.

30. *Id.* at 1053 ("In January 1999 Price complained to the state troopers about the *snowmachiners* trespassing on his land. This was the first time he publicly complained about the trail's use." (emphasis added)).

31. *Price II*, 128 P.3d at 732.

32. There was some evidence in the first trial suggesting that non-snowmachine users may have met some of the elements for establishing an easement by prescription. For example, there

was evidence that a dog musher and her handlers may have used the trail during the 10–year prescriptive period for training, one trail user testified that he had skied on the trail in the wintertime continuously from 1959 to 2000, and Price's brief acknowledges that four ATVers regularly use the trail during the fall hunting season. The superior court has never made findings about whether these users satisfied all of the required elements to establish easements by prescription.

ment's volume of use, seasonality of use, width, and allowance for improvements. Because the easement is limited to snowmachiners—as described above—we review the superior court's findings with this narrower focus in mind. When reviewing findings by the superior court, we abide by the general principle that "[a]lthough the use made of a prescriptive easement may evolve beyond the original prescriptive uses, new uses cannot substantially increase the burden on the servient estate or change the nature and character of the easement's original use." [33] In other words, the scope of an easement does not need to remain static, but changes in its use must remain within the bounds of what "a landowner in [Price's] position ... should reasonably have expected to lose by failing to interrupt the adverse use before the prescriptive period had run." [34]

## 1. The superior court did not err in finding that there was no significant increase in snowmachine traffic across Price's property.

At the heart of Price's claim is the contention that snowmachine traffic significantly increased during and after the ten-year prescriptive period: the winter of 1988–89 to the winter of 1998–99.[35] Price claimed that the snowmachiners' lease of a new parking lot in 1996—"the Jones lot"—led to increases in traffic beyond the volume of use at the beginning of the prescriptive period in 1988–89. Several witnesses testified that this lot was used by snowmachiners to get to the Caribou Hills area or to access the Snomad clubhouse. Price argued that the parking lot allowed more snowmachiners to access the trail that crosses his property. To support his claim at the 2006 trial, Price introduced considerable testimony, much of it conflicting, about the increased parking capacity of the lots near his property. But the superior court concluded: "[P]arking availability does not inform this court in which direction and over which trail an [off-loaded] snowmachine or RV from the Jones lot traveled." The superior court found that, "while there has been increased snowmachine use in the Caribou Hills generally, the use of snowmachines over Price's land cannot be said to have increased or decreased significantly from the use that was being made of the easement area before the Jones parking lot was created in 1996." [36]

■■■■■ Our review of the record confirms that the superior court did not clearly err in its 2007 finding that snowmachine traffic across Price's land did not significantly increase above the level that existed during the prescriptive period. We recognize that "[an easement] holder is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment." [37] But this consideration must be

---

**33.** *Price I,* 75 P.3d at 1058 (citing *House v. Hager,* 130 Or.App. 646, 883 P.2d 261, 264–65 (1994)).

**34.** *Id.* (quoting RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4.1 cmt. h (2000)) (internal quotation marks omitted).

**35.** *See Interior Trails Pres. Coal. v. Swope,* 115 P.3d 527, 529 ("[A] prescriptive easement ... requires ten years of continuous use[.]" (citing *McGill v. Wahl,* 839 P.2d 393, 397 (Alaska 1992))).

**36.** This finding is inconsistent with the superior court's February 9, 2000 findings. The February 9, 2000 findings observed:

Particularly troubling to the court is the factual situation exemplified by the case at hand, where a public easement might be created by a relatively small number of people, followed by a dramatic increase in those wishing to use the trail.... If ... the landowner fails to prevent ten members of the public from using the trail,

can he really have been said to have slept on his rights as against fifty, or five hundred, or five thousand users?

After the superior court's February 9, 2000 findings, *Price II* noted: "In the record before us, there is evidence to suggest a significant change in use." 128 P.3d at 729. This was based on the "opinion of February 9, 2000, [in which] the superior court note[d] that evidence in the record suggests that the trail was used only occasionally for many years by a small number of people." *Id.* This was the origin of our direction to the superior court to define the scope of the easement, including the consideration of whether any increase in volume overburdened the servient estate.

The superior court's 2007 order acknowledges that "[a]fter many days of hearings over the subsequent years, the court is now satisfied that the illustration in February 2000, overstated changes in volume of use over the years."

**37.** RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4.10 (2000).

balanced against the principle that "[t]he manner, frequency, and intensity of [an easement's] use may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefitted by the servitude." [38] The superior court found that "[a]ny increase in snowmachine traffic has been reasonable and consistent with traditional uses of the easement area[,]" and the evidence supports this finding.

### 2. The superior court must establish seasonal limits on the use of the easement by snowmachiners.

Price also contends that the superior court erred in ruling that it would not constrain the seasonality of the easement's use. In *Price I* we instructed the superior court to define the easement's scope by imposing restrictions upon it, including potentially limiting the use to certain seasons.[39] The superior court's most recent findings did not limit the seasonality of the easement's use; instead, the superior court explained:

> Damage to Price's property can be minimized by restricting use of the easement area to winter time use when the ground is frozen and covered with snow. But there are hunters, hikers, recreational RV users and other persons whose only access to their camps or residences or Caribou Hills is use of the easement area and the unavailability of the easement area during the non-winter months would violate their rights to prescriptive use.

Given our holding that the superior court's findings only have established a prescriptive easement for snowmachiners, the superior court's failure to define the seasonal limits of the trail's use—based on the understanding that other users accessed the trail year-round—requires remand. The superior court must establish the seasonal limitations on use of the easement by snowmachiners. This is necessary because evidence at trial included photos showing deep ruts on Price's land filled with water; it is clear that use of the trail when the ground is not frozen has

indeed caused damage. Price testified the damage was caused by use of the trail by both snowmachiners and other users too late in the spring when the ground starts to thaw, and there was no conflicting evidence presented on this point. If necessary, the superior court may solicit input from the parties on the appropriate measure to use to determine when the ground is too soft for snowmachiners to travel across it without damaging the land, and how the trail may be marked to signal that it is closed to snowmachine traffic at the end of the snowmachine season.

### 3. The superior court did not err in determining that snowmachiners may maintain and mark the trail to accommodate reasonable use and enjoyment of the easement.

 The superior court's 2007 order concluded that easement holders:

> [S]hould be allowed to remove deadfall and willows prior to freeze up for purposes of maintaining the trail and for safety. [They] should be able to place signs along side the trail clearly identifying the boundaries of the trail and there should be no prohibition on grooming which does no damage to the property of [Price].

These types of activities are consistent with the prescriptive use, and we find no error in this portion of the superior court's ruling. The Restatement (Third) of Property allows for the holder of an easement:

> [T]o make any use of the servient estate that is reasonable for enjoyment of the servitude, including the right to construct, improve, repair, and maintain improvements that are reasonably necessary. The right of the easement ... owner is qualified, however, by the general principle that the use may not interfere unreasonably with the enjoyment of the servient estate.[40]

We affirm the superior court's ruling that snowmachiners may clear, mark, and groom the trail to accommodate responsible use and

---

**38.** *Id.*

**39.** *Price I,* 75 P.3d at 1059.

**40.** Restatement (Third) of Prop.: Servitudes § 4.13 cmt. b (2000).

enjoyment of the easement. Marking the trail, picking up deadfall, and grooming the trail to establish a defined path are certainly consistent with the snowmachiners' right to "improve ... and maintain improvements that are reasonably necessary" for their enjoyment of the trail. Clearing the trail and marking it should help snowmachiners use the easement without damaging their snowmachines or themselves, and should minimize the number of snowmachiners who veer off the trail and trespass on Price's land.

■ We also recognize the potential for abuse that comes with grooming a trail and making it easier to ride. Price argues that the improved trail "allowed increases in speed to possibly 100 miles per hour." The superior court found that "[t]here was evidence, mostly anecdotal, that some users of snowmachines ... drink alcohol to excess and travel on their machines at unsafe speeds and act irresponsibly towards the property of others." While easement holders may make improvements that are reasonably necessary to enjoy their servitude, the Restatement makes clear that this right is qualified by the right of the landowner to avoid unreasonable interference with the quiet enjoyment of his or her property.[41] The evidence at the first trial established that snowmachiners used the trail across Price's land between the winter of 1988–89 and the winter of 1998–99 to gain access to Caribou Hills recreational area. There was no evidence that the Snomads or other snowmachine users needed to cross Price's property at excessive speeds; high-speed travel does not fall within the easement's original purpose as an access trail to other recreational areas. Excessive speeds and the associated increase in noise is not an improvement reasonably necessary for enjoyment of the easement,

and this type of use can significantly interfere with Price's quiet use and enjoyment of his property.[42] Accordingly, on remand the superior court should establish a speed limit for use on the trail across Price's property. Price may post the speed limit if he chooses to do so.[43]

### 4. There were not sufficient findings to justify establishing the width of the easement as 18 feet.

*Price I* also suggested that the superior court define the easement's width.[44] The superior court issued a brief order setting the width of the easement at 16 feet,[45] but the superior court's 2007 decision increased the width of the easement to "18 feet ... [which is] sufficient to permit two snowmachines traveling in opposite directions to pass each other safely."

We agree with Price that the superior court's findings concerning the width of the easement are not supported by the record. First, the superior court increased the width of the easement from 16 feet (in its 2004 order) to 18 feet (in its 2007 order) without providing any findings or explanation for doing so. Without any additional findings, the revised width is unsupported by the record.

■ Second, and perhaps more importantly, we cannot find anything in the record to suggest that the easement was 16-feet wide during the prescriptive period; to the contrary, the testimony suggests that the 16-foot width only came about once the Snomads began grooming the trail around 1998. Given this evidence, even the 16-foot width must be reconsidered.[46] It is uncontested that an 8-foot trail permits one lane of snowmachine travel. If the easement's use has

---

41. *Id.*

42. *See id.*

43. We are mindful that this has been a contentious case. Nothing in this decision implies that Price is free to enforce the speed limit across his property on his own. But as the superior court implied in its 2007 findings, users who exceed the scope of the easement by littering, veering off of the trail, exceeding the speed limit, or crossing the trail where the ground is too soft, may be liable to Price in trespass.

44. *Price I*, 75 P.3d at 1059.

45. *Price II*, 128 P.3d 725, 727 (Alaska 2006).

46. The superior court may have been concerned that a safety issue was presented by snowmachines traveling on the trail at high speeds, but as explained, there has been no showing that high-speed travel is consistent with the use of the trail during the prescriptive period.

evolved to require widening the path, the superior court must make specific findings as to the reasonableness and necessity of increasing the width of the easement. Without these findings, the record does not support an easement more than 8–feet wide.[47]

### C. Vesting The Easement In A Government Agency

Finally, Price argues that the superior court erred by failing to identify a State agency or political subdivision as the holder of the easement under AS 09.45.052(d). Whether the superior court was required to do so is a question of law, which we review de novo.[48]

Alaska Statute 09.45.052(d) provides in relevant part:

> [T]he uninterrupted adverse notorious use ... of private land for ... public access purposes ... by the public, ... for a period of 10 years or more, vests an appropriate interest in that land in the state or a political subdivision of the state. This subsection does not limit or expand the rights of a state or political subdivision under adverse possession or prescription as the law existed on July 17, 2003.

This section was added to AS 09.45.052 in July 2003.[49] The easement across Price's land was perfected by the time he put up

"No Trespassing" signs in 1998.[50] Alaska Statute 09.45.052(d) did not exist at the time this public easement was perfected and the legislature did not instruct that this statute should be applied retrospectively.[51] Therefore, the superior court did not err by not identifying a State or political subdivision to hold the interest in the easement.

## V. CONCLUSION

We REVERSE the superior court's ruling that non-snowmachine users have established the right to a prescriptive easement across Price's property. We AFFIRM the superior court's determinations that the permissible uses of the trail include grooming, marking, and clearing of the trail, and we AFFIRM the finding that any increase in the volume of snowmachine traffic has not overburdened the easement. But we REVERSE the superior court's findings concerning the easement's width and REMAND for a determination of an appropriate speed limit and seasonal limitation for the snowmachine easement.

---

**47.** We recognize that there may be times where snowmachiners coming from different directions will need to get off the trail to allow one another to pass. A minor diversion off the trail for this purpose fits within the principle that "the holder of an easement ... is entitled to make any use of the servient estate that is reasonable for enjoyment of the servitude." RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4.13 cmt. b (2000). Temporarily veering from the trail to allow another snowmachine to pass and establishing a two-snowmachine-wide easement are different things: the latter is a significant change in purpose that would require factual findings, the former is not.

**48.** *Jacob v. State, Dep't of Health and Social Servs., Office of Children's Servs.,* 177 P.3d 1181, 1184 (Alaska 2008).

**49.** AS 09.45.052, *as amended* by ch. 147, § 4, SLA 2003.

**50.** *Price I,* 75 P.3d 1051, 1053 (Alaska 2003).

**51.** *See* AS 01.10.090 ("No statute is retrospective unless expressly declared therein."); *see also* Minutes, Sen. Labor & Commerce Standing Comm. Hearing on S.B. 93, 23rd Leg. 1st Sess. (March 11, 2003) (Testimony of Amy Seitz, staff to Senator Wagoner, sponsor of the bill) ("[Proposed AS 09.45.052] ... will not extinguish already vested adverse possession claims."); Minutes, Sen. Labor & Commerce Standing Comm. Hearing on S.B. 93, 23rd Leg. 1st Sess. (March 11, 2003) ("Chair Bunde asked if [proposed AS 09.45.052] will have any retroactive impacts or whether it only applies to actions in the future. Mr. Tillinghast [Sealaska Corp.] replied it is prospective.").